United States District Court
Southern District of Texas
**ENTERED**
May 19, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LESLIE DOYLE, *on Behalf of Himself and All Others Similarly Situated*, | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | CIVIL ACTION H- 18-2941 |
| ENSITE USA, INC., | § § | |
| *Defendant*. | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendant EnSite USA, Inc.'s ("EnSite") motion for decertification of a conditionally certified Fair Labor Standards Act ("FLSA") collective action. Dkt. 60. Having considered the motion, response, reply, and applicable law, the court is of the opinion that the motion should be GRANTED.

### I. BACKGROUND

The parties filed a stipulation regarding conditional collective action certification in which they agreed to the following definition of the conditionally certified collective action: "All current and former individuals who worked for EnSite in the Inspector position and [were] paid a day rate between April 13, 2015 through the present." Dkt. 28 (agreed order granting stipulation regarding conditional collective action certification). The parties also agreed to the form of the notice as well as procedures for sending the notice. *See id.* The court entered an order approving the stipulation and thus conditionally certified the class and approved the agreed notice. *Id.* Approximately one month later, the court began receiving notices of consent. *See* Dkts. 29–51.

1

Currently, there are a total of seventy-five members of the conditionally certified collective action (the "Opt-Ins").[1] *See* Dkt. 60.

EnSite moves for decertification of the collective action because the named plaintiff, Leslie Doyle, and the Opt-Ins "are demonstrably dissimilar in terms of work experience and duties," in that they have nine different job titles with different job descriptions and day-to-day responsibilities and even worked for different EnSite clients under projects governed by separate contracts. *Id.* EnSite also argues that, unlike many of the Opt-Ins, Doyle's work at EnSite was only for a brief amount of time not within the two-year FLSA statute of limitations for non-willful violations. *Id.* EnSite additionally contends that Doyle is dissimilar from the Opt-Ins who allege they did not receive annualized compensation of $100,000, which makes Doyle subject to an exemption that lower-paid Opt-Ins are not. *Id.* EnSite asserts that these differences mean that individualized inquiries will be required, making proceeding as a collective action inappropriate. *Id.*

Doyle disagrees. He asserts that EnSite paid him and all of the Opt-Ins under the same pay plan, which was a day rate without overtime. Dkt. 63. He contends that their jobs were similar manual inspection jobs with the same core duties. *Id.* He notes that EnSite continues to maintain that all of the Opt-Ins are exempt, and he asserts that these exemption defenses can all be resolved via common evidence. *Id.* Additionally, he contends that the same questions of law will be raised for all of the Opt-Ins—specifically, did EnSite's pay policy provide a predetermined, guaranteed minimum that would meet the salary basis test? *Id.* With regard to EnSite's contention that Doyle and the Opt-Ins have different job descriptions and clients, Doyle asserts that "even EnSite's job

---

[1] At the time the motion was filed, there were seventy-six members. On May 17, 2021, Richard Johnson withdrew his consent. Dkt. 70.

descriptions highlight the similarities between its inspectors regardless of what they inspected, who EnSite's customer was, or where the work took place." *Id.* According to Doyle, they all used the same pre-determined guidelines and standards. *Id.* Doyle asserts that "[w]e don't need dozens of trials to determine whether the **one** pay practice EnSite maintained complies with the FLSA's salary basis test . . . [or] to determine the primary duty of EnSite's inspectors." *Id.*

EnSite filed a reply in which it argues that Doyle did not meet his burden of showing he and the Opt-Ins are similarly situated and instead provides nothing but conclusory allegations. Dkt. 64.

The motion to decertify is now ripe for disposition.[2] The court will first discuss the legal standard under which it will consider EnSite's motion, and then it will address the parties' arguments.

## II. LEGAL STANDARD

Prior to the Fifth Circuit's recent opinion in *Swales v. KLLM Transport Services*, courts in the Southern District of Texas followed the two-stage *Lusardi* approach to FLSA collective action certification. *See Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021) (rejecting the "'near-universal'" two-step certification test (quoting *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018)); *Badgett v. Taco Cabana*, L.P., No. H-05-3624, 2006 WL 2934265, at *1–2 (S.D. Tex. Oct. 12, 2006) (Miller, J.) (adopting the *Lusardi* approach, which was "the one utilized by other courts in the Southern District of Texas"). The stipulation of conditional

---

[2] In the response to the motion to decertify, Doyle advised the court that he had notified the clerk of a discovery dispute relating to opt-in discovery that had never been resolved. Dkt. 63 at 3 n.1. The court contacted the parties to inquire about the status of this dispute, and the parties informed the court via email on May 4, 2021, that there was no need to resolve the dispute prior to the court ruling on the instant motion.

3

certification was filed and approved based on this approach. The *Lusardi* approach involves a "notice" stage, during which the court considers whether to conditionally certify a collective action and allow notice to potential collective action members, and a "decertification" stage, which occurs after discovery is largely complete and includes a consideration of whether the evidence obtained during discovery supports continuing to consider the claims of the named plaintiff and opt-in members collectively. *Badgett*, 2006 WL 2934265, at *1–2. Because this case was conditionally certified under the *Lusardi* approach, it is appropriate at this point to consider whether it should be decertified, as requested by EnSite. Or, in other words, the court must determine whether the claims should continue collectively or if the claims of the Opt-Ins are more appropriately considered individually. While the court finds it appropriate to make its decertification decision under the *Lusardi* framework since this case was conditionally certified, it also is guided by the certification standard set forth by the *Swales* court, which noted that district courts have "broad, litigation-management discretion," but instructed that district courts must "rigorously scrutinize the realm of 'similarly situated.'" *See Swales*, 985 F.3d at 434.

The court must "make a factual determination as to whether there are similarly situated employees." *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 930 (S.D. Tex. 2009) (Rosenthal, J.). The plaintiffs have the burden to prove that the putative class members are similarly situated, and the court's analysis during the second stage of the *Lusardi* approach is "more searching than it was at the conditional certification stage." *Id.* at 931. Similarly, the certification decision under *Swales* places the burden on the plaintiff. 985 F.3d at 443 n.65 ("While the text of § 216(b) [of the FLSA] is not explicit on this point, we hold that such a burden follows from the general burden that a plaintiff bears to prove her case. This makes sense as a practical matter as well, as the plaintiff should not be able to simply dump information on the district court and expect the court

4

to sift through it and make a determination as to similarity."). Courts must keep in mind that similarly situated is not the same as identically situated. *Maynor*, 671 F. Supp. 2d at 931. In making the similarly situated determination, courts consider the following three factors: "'(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural concerns.'" *Id.* (quoting *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008)). "The three factors are not mutually exclusive and there is generally overlap among them." *Id.* (citations and quotations omitted).

### III. ANALYSIS

Before proceeding with the decertification analysis, the court must discuss an allegation in Doyle's response that EnSite violated mediation rules by relying on confidential information provided during the mediation in its motion to decertify. *See* Dkt. 63. Doyle requests that the court not rely on that information when considering the motion to decertify. *See id.* After determining what evidence it may consider, the court will turn to the similarly situated inquiry and determine whether it should continue to hear the claim of Doyle and the Opt-Ins collectively.

**A.     Evidence Disclosed During the Mediation**

Doyle alleges that EnSite improperly disclosed information obtained during the parties' second mediation in its motion to decertify. Dkt. 63. The specific information at issue is how many hours Doyle claims he worked in a day. *See id.* Doyle asserts that EnSite is expressly prohibited from relying on statements made during the mediation in its motion. *See id.* (citing the mediation confidentiality provision).

In response, EnSite asserts that Doyle "cannot argue with any seriousness that there is something confidential about the number of hours he claimed to work for EnSite." Dkt. 64. EnSite

5

points out that if one compares the complaint (Dkt. 1) and Doyle's timesheets (Dkt. 60-1 Ex. A-5), it is clear that Doyle alleges he worked at least twelve hours a day and only reported ten hours to EnSite. *Id.*

The court agrees with EnSite. The complaint states that "Doyle worked at least 12 hours per day, generally and anywhere from 21 to 35 days straight, performing non-exempt duties." Dkt. 1 ¶ 27. He contends that he "received a day rate as his only form of compensation and did not receive overtime compensation when he worked over 40 hours in a workweek." *Id.* ¶ 45. Doyle's timesheets reflect that, with a few exceptions, Doyle only reported working ten hours per day. *See* Dkt. 60-1, Ex. A-5 at ENSITE000888–893. Moreover, the number of hours Doyle worked in a day is what is at issue in this lawsuit and needed to be disclosed outside of mediation anyway. Thus, to the extent Doyle is seeking exclusion of this information as a sanction for an alleged violation of the rules of mediation, that request is DENIED.

**B.    Similarly Situated Inquiry**

The court now must determine whether it should continue to consider Doyle's and the Opt-Ins' FLSA claims collectively. In the complaint, Doyle contends that EnSite paid him and similarly situated employees a day rate and that he worked at least twelve hours a day and between twenty-one and thirty-five days straight. Dkt. 1. He claims that he and other day-rate employees were not paid overtime for hours worked in excess of forty hours per week. *Id.* He asserts that he performed non-exempt duties and that his duties and other day-rate employee's primary duties were manual in nature. *Id.*

In its answer, EnSite denies that it employed non-exempt day-rate employees. Dkt. 12. It asserts nineteen affirmative defenses, including that the claims fall within "the professional

exemption, the executive exemption, the outside sales exemption, the highly compensated exemption, the administrative exemption and/or the combination exemption." *Id.*

The arguments relating to whether the FLSA claims should be considered collectively boil down to (1) whether EnSite's pay policy provided a pre-determined and guaranteed minimum that meets the salary basis test; (2) whether the inspectors all had similar primary job duties, making it appropriate to consider the exemptions collectively; and (3) whether the employees who have claims from more than two years prior to the filing of this lawsuit should be part of the same collective action as those whose claims are within the limitations period for non-willful violations of the FLSA. The court will consider these three topics *in seriatim*.

### 1. Salary Basis

One of the key issues in this case is whether the way EnSite pays its inspectors meets the requirements of 29 C.F.R. § 541.604(b). *See* Dkts. 63, 64. Doyle contends that there is one pay practice that is common to the entire collective action and that the exemptions EnSite relies on all require proof that EnSite's pay plan meets the salary basis test. Dkt. 63. Doyle argues that under this test the same questions of law will be raised for all of the plaintiffs; namely, did the pay policy provide a pre-determined and guaranteed minimum that meets the salary basis test? *Id.* Doyle contends that dozens of trials are not necessary to answer this common question. *Id.* He asserts that EnSite must provide evidence that despite paying a day rate and despite what the offer letters say, its policy—as applied—met the salary basis test. *Id.* He contends that the way EnSite's pay policy was applied is the same for all inspectors as they were all subject to the same universal pay policy. *Id.* (citing *Thrower v. Universal/Pegasus, Int'l Inc.*, 484 F. Supp. 3d 473, 483 (S.D. Tex. 2020)). He points out that the court's inquiry will focus not on whether each plaintiff experienced improper deductions but whether they were all "subject to" improper deductions under EnSite's

7

pay policy. *Id.* (citing § 541.602(a)) (quoting 69 Fed. Reg. 2212201, at *22180 (Final Rule 2004) "An exempt employee who has not suffered an actual deduction nonetheless may be harmed by an employer docking the pay of a similarly situated co-worker.")). Doyle asserts that collective-wide determinations are needed to determine if EnSite actually paid the inspectors on a salary basis and whether it had a practice of making improper deductions. *Id.*

EnSite disagrees with Doyle's contention that the salary basis issue in this case means that collective consideration is appropriate. Dkt. 60. EnSite asserts that (1) evidence of a common pay policy is not dispositive—there must be other facts that bind the claims; and (2) even if a common pay policy were sufficient, here Doyle is not an adequate representative of a class of employees arguing EnSite's policy violated the minimum weekly salary required for the various exemptions EnSite asserts. *Id.* EnSite contends that it paid Doyle for six guaranteed days per week at $450 per day regardless of the number of hours he worked. *Id.* (relying on the terms of Doyle's offer letter, exhibit A-4 to the motion to decertify). EnSite notes that it did not ever reduce Doyle's salary for days he was ready, willing, and able to work, and, to the extent there are Opt-Ins who claim not to have received a guaranteed minimum, he is not similarly situated to those members. *Id.* EnSite asserts, moreover, that Doyle does not provide any evidence that any of the inspectors were subject to improper deductions that would negate the exemption. Dkt. 64. It argues that the critical point of this analysis is not the existence of a plan, but how EnSite actually paid its employees in practice. *Id.* (citing *Escribano v. Travis Cnty., Tex.*, 947 F.3d 265, 274 (5th Cir. 2020)). EnSite points out that Doyle does not provide any evidence indicating that it subjected any of its inspectors to improper deductions. *Id.*

Under 29 C.F.R. § 541.604(b),

8

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned. The reasonable relationship test will be met if the weekly guarantee is roughly equivalent to the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek.

Exempt executive and administrative employees who are paid on a daily basis must be paid a minimum, during the events of this lawsuit, of "not less than the 40th percentile of weekly earnings of full-time nonhourly workers in the lowest-wage Census Region," which at the time of Doyle's employment was $455 per week.[3] *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Computer and Outside Sales Employees, 81 Fed. Reg. 32,549 (May 23, 2016); § 541.100(a)(1) (2016) (executive exemption minimum salary provision); § 541.200(a) (administrative exemption minimum salary provision). Exempt highly compensated employees must have received "total annualized compensation of at least the annualized earnings amount of the 90th percentile of full-time nonhourly workers nationally, which increased to $107,432 on January 1, 2020. 81 Fed. Reg. 32,550 (May 23, 2016); § 541.601(b)(1) (2016) (highly compensated employee exemption minimum weekly salary provision); *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Computer and Outside Sales Employees, 84 Fed. Reg. 51,230, 51,231 (discussing the amount of the highly compensated employee provision between 2004 and 2020).

---

[3] The minimum rate changed to $684 per week effective January 1, 2020. *See, e.g.*, § 541.100(a)(1) (2020).

There is some dispute in this circuit as to (1) whether an employee paid on a daily rate can is paid on a "salary basis" under certain FLSA overtime exemptions; and (2) whether employers claiming certain exemptions must satisfy both the minimum weekly required by the statute *and* the reasonable relationship test of § 541.604(b). *See Hewitt v. Helix Energy Sols. Grp.*, 956 F.3d 341 (5th Cir. 2020) (holding that "an employee who is paid on a daily rate is not paid on a 'salary basis' under 29 C.F.R. § 541.602(a)), *substituted by* 983 F.3d 789 ("So an employer can pay a daily rate under § 541.604(b) and still satisfy the salary basis test of § 541.602—but only if the employer complies with both the minimum weekly guarantee requirement and the reasonable relationship test."), *vacated* 989 F.3d 418 (5th Cir. Mar. 9, 2021) (noting that the majority of judges voted in favor of a rehearing *en banc* with oral argument); *see also Hewitt*, 983 F.3d at 802 (Wiener, J., dissenting) ("Consistent with two other circuits, I would not apply the reasonable relationship test to highly compensated employees."); *Hewitt*, 983 F.3d at 803 (noting that the employee met the requirements of the highly compensated exemption and questioning why the "panel majority require[d] more" because, under Judge Weiner's reading, the text of § 541.601 does not require an employee meet § 541.604(b)'s reasonable relationship test). However, the court need not make a determination on these issues in order to make the decertification decision.

In *Thrower*, which Doyle cites in support of continued certification, the court was considering a motion for conditional certification (pre-*Swales*), which is a more lenient standard than courts apply after the parties have engaged in discovery, even under the *Lusardi* approach as it customarily was used in the Southern District of Texas. The court, relying on the original opinion in *Hewitt v. Helix*, which has been withdrawn and substituted by an opinion that has also be vacated pending *en banc* review, determined that a case-by-case determination regarding the application of pay policies was unnecessary when an employer is relying on an exemption that

10

required payment of a minimum salary and the employer allegedly paid a day rate that was subject to change based on the number of days worked in a week. *Thrower*, 484 F. Supp. 3d at 483. The *Thrower* court noted that if all the potential members of the collective action "were subject to the same pay practices" as alleged, it would be a "*per se* violation of the FLSA—*i.e.*, the differences between class members' particular job titles and responsibilities [would not be] material to the allegations in the case." 484 F. Supp. 3d at 486. Of course, at the conditional certification no evidence of the pay practices was required. The fact that this decision was made at the first (very lenient) stage of the *Lusardi* analysis and relied on a now-vacated Fifth Circuit opinion reduces its persuasive appeal.

EnSite relies on *Escribano*, a recent Fifth Circuit opinion considering the propriety of a district court ruling on a Rule 50(b) motion for a ruling as a matter of law in an FLSA case involving the salary basis test. 947 F.3d at 267. The Fifth Circuit found that there "was no evidence of an impermissible reduction practice" for the members of the collective action, and because the members could not demonstrate that their pay was actually subject to improper deductions, the employer was entitled to judgment as a matter of law on that issue. *Id.* at 274. The court also noted that even if there were evidence of a policy to improperly deduct, it would not cause the exemption to be lost if there was no evidence that any manager ever used the policy to make improper deductions. *Id.*

Here, given the Fifth Circuit's directive in *Swales* to "rigorously scrutinize the realm of 'similarly situated' workers" and identify the facts and legal considerations material to determining whether the proposed members of a collective action are similarly situated, and the fact that the burden of showing the members are similarly situated rests squarely with the plaintiff, there is no escaping that Doyle has not provided the court with any evidence to show that the salary basis

11

issue is going to be dispositive in this case. He has not shown or even presented the court with an issue of fact that one person was subject to an improper deduction. The court therefore must consider whether the proposed collective is similarly situated with regard to other issues that will be important absent a finding that the exemption is lost for all regardless of job duties due to improper deductions.

2. **Job Duties**

In its motion to decertify, EnSite contends that Doyle and the Opt-Ins have many different job titles and duties, noting that Doyle's official title was "Safety Inspector," and the Opt-Ins' job titles are spread over nine other inspection positions, with the highest concentrations being Chief Inspectors, Gas/General/Utility Inspectors, and Welding Inspectors. Dkt. 60. EnSite provides a declaration from its Vice President of Construction Management and Inspections Services who states that EnSite's "inspection service is multi-faceted and includes a diverse range of inspectors that have different qualifications, certifications and specializations." Dkt. 60-1. EnSite contends that the Opt-Ins worked for at least sixteen different EnSite clients on more than eighty-two different projects during the relevant time period and that there are individual contracts governing the scope and manner in which work was to be performed for each separate project. Dkt. 60. EnSite states that Doyle, who worked for a general contractor client, had a more predictable work schedule than inspectors who worked for capital clients constructing new pipelines. *Id.* EnSite also asserts that some of the Opt-Ins complain that they were instructed to record only ten hours of time each day, which is not a claim of Doyle and some other Opt-Ins, making the collective action members not similarly situated. *Id.* EnSite contends that claims for work for unrecorded hours must necessarily be determined on an individual basis. *Id.* EnSite argues that collective

treatment of this diverse group does not promote judicial economy because the court must engage in individual fact-finding as it relates to each claimant's job duties. *Id.*

In response, Doyle asserts that the seventy-six individuals in the class are all employed by EnSite as inspectors. Dkt. 63. He contends that inspectors "are hired to run routine inspection tests, based on pre-determined guidelines and standards, for the companies that contract with EnSite." *Id.* He acknowledges that the Opt-Ins hold different titles, but he points out that 31% of the Opt-Ins worked in more than one subset of inspector jobs. *Id.* (citing Dkt. 63, Ex. B at ENSITE000885). Doyle points to his declaration and the declarations of two of the opt-in plaintiffs stating their job duties. *Id.* (citing the declarations attached to docket entry 26). In Doyle's declaration, he states: "As an inspector, I spent the majority of my time performing on-site safety inspections. Regardless of the job site I was assigned to, my essential job duties did not change." Dkt. 26, Ex. A ¶ 10. Opt-in class members Jerry Sumrall and Anthony Lemmo provided the same descriptions in their declarations. Dkt. 26, Ex. B ¶ 10 & Ex. C ¶ 10. Doyle points out that courts cannot rely solely on generic job descriptions when determining if an employee is exempt and instead must look to the specific duties of the employee. Dkt. 63 (citing *Vela v. City of Houston*, 276 F.3d 659, 677 (5th Cir. 2001)). Doyle asserts that the duties performed by the different types of inspectors are similar enough among the members of the collective action to consider collectively, but also notes that the court may adjust the collective action as it deems appropriate. *Id.*

In reply, EnSite points out that it is the plaintiff's burden to establish that members of the collective action are similarly situated. Dkt. 64 (citing *Swales*, 985 F.3d at 443 n.65). It argues that Doyle did not present sufficient evidence of similarities between himself and the Opt-Ins. *Id.* EnSite notes that the relevant inquiry is whether EnSite subjected Doyle and the other inspectors

13

to improper time deductions and points out that Doyle did not provide any evidence that EnSite improperly reduced his guaranteed salary or subjected any other inspector to improper deductions. *Id.* EnSite further argues that the declarations provided by Doyle "fall far short of establishing any similarities because they make only broad and general statements about the work performed." *Id.* EnSite notes that these declarations do not state what type of inspector work the individuals performed or that they have personal knowledge of the job duties of any of the other inspectors. *Id.*

Again, in *Swales*, the Fifth Circuit has instructed that district courts "must rigorously scrutinize the realm of 'similarly situated' workers." 985 F.3d at 434. The court must "identify . . . what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Id.* at 441. Instead of showing that the Opt-Ins had similar duties, Doyle points to declarations of two Opt-Ins and his own declaration that conclusorily state that the majority of work time was spent "performing safety inspections." However, according to the declaration EnSite provides, the members of the collective action have numerous different job titles and job descriptions. For example, fourteen of the Opt-Ins are chief inspectors whose job duties include supervising all phases of filed quality assurance and control and directly overseeing the work of inspectors. Dkt. 60-1 ¶¶ 4–5. Twenty-eight of the members are gas or general utility inspectors. *Id.* ¶ 4. These inspectors "look for and report environmental issues to the client." Their "job duties vary from day to day depending on the client's requirements and can encompass such matters as pipe stringing, pipe bending, and pipe coating as well as lowering pipe into the ditch and checking the depth of cover after backfilling over the pipe." *Id.* ¶ 5. Four of the members are materials inspectors or coordinators. *Id.* ¶ 4. A material inspector ensures "that the pipe and material [meet] contract specifications as to dimensions and quality" and maintains "records as to

14

individual joints of pipes." *Id.* ¶ 5. Five of the members are safety inspectors. *Id.* ¶ 4. Safety inspectors "are responsible for enforcing . . . all of the client's safety policies, ensuring industry best practices are met, and making sure state and federal safety requirements are met." *Id.* ¶ 5. Twenty-one of the members are welding inspectors. *Id.* ¶ 4. Welding inspectors "test the welders on their abilities and have the ability to make hiring and firing recommendations based on the results of the testing [of] the welders." *Id.* ¶ 5. They also "examine welding equipment to ensure its proper performance." *Id.* This is just a sample of the descriptions of the job duties of the Opt-Ins. *Id.* While the court is cognizant that it may not rely solely on these descriptions when it determines whether the employees were indeed exempt, as Doyle points out, here the question is whether the employees are similarly situated, and Doyle has not provided the court with any details to rigorously scrutinize. It is his burden to show that the court should consider the claims of these different types of inspectors collectively.

The court agrees that the job descriptions all relate to inspecting something, and the declarations provided by Doyle indicate at least three members of the proposed collective spent the majority of their time performing inspections related to safety. We do not know, however, what these inspections involved. For instance, did they involve manual work or looking through paperwork? The job descriptions provided by EnSite suggest that this may well depend on the specific job title. While certainly, as Doyle notes, it is not his duty to prove the affirmative defenses, it is his duty to show that the plaintiffs are similarly situated with regard to the facts that are relevant to the issues. In this case, the court will be asked to determine whether certain exemptions to the FLSA apply, including the highly compensated exemption and the administrative exemption. Just looking at the administrative exemption, the court will need to determine whether the primary duty of the collective action members was "the performance of

15

office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and whether that "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The job descriptions themselves indicate that the answers to these questions may depend on which of the several different inspector jobs the individual members had. Doyle has not brought forward any evidence to controvert the seemingly disparate types of duties described by EnSite, and Doyle has the burden of demonstrating that the collective action members are similarly situated. He has not met that burden.

### 2. Statute of Limitations

EnSite further asserts that Doyle is not an appropriate class representative because his claims fall outside of the statute of limitations for non-willful violations of the FLSA. Dkt. 60. It notes that fifteen of the seventy-six Opt-Ins have claims that fall completely outside of the limitations period. *Id.* Doyle points out that whether the violations were willful is easily considered on a call-side basis. Dkt. 63. The court need not reach this issue since it has found that Doyle did not otherwise meet his burden of showing he and the Opt-Ins are similarly situated.

## IV. Conclusion

Doyle's burden is more stringent at this stage than it was when the case was conditionally certified under *Lusardi* and more stringent, regardless, given the Fifth Circuit's *Swales* opinion. Doyle has not demonstrated that the collective action members are similarly situated with regard to the facts that must be considered in this case. Accordingly, EnSite's motion to decertify the conditionally certified collective action (Dkt. 60) is GRANTED. The collective action is hereby DECERTIFIED.

Signed at Houston, Texas on May 19, 2021.

_____
Gray H. Miller
Senior United States District Judge